IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Teddy Pyatt, #277497, | ) CIVIL ACTION NO. 9:12-0266-MGL-BM |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| William Byars, South Carolina Dept. of | ) |
| Corr. Commissioner, and Robert E. Ward, | ) |
| Deputy Dir. Div. of Operations, in their | ) |
| Ofc. Ind. Capacity, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983, as

well as pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C.

§ § 2000(c), et. seq. Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC),

alleges violations of his constitutional and religious rights by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56,

Fed.R.Civ.P., on October 10, 2012. That motion, which was based on an alleged failure of the

Plaintiff to exhaust his administrative remedies prior to filing this lawsuit, was denied by Order of

the Court filed April 30, 2013. However, by consent of the parties, a supplemental Order was entered

on October 16, 2013 allowing the Defendants to file a new motion for summary judgment *for the*

*limited purpose* of asserting a qualified immunity defense to Plaintiff's claims.[1] Defendants thereafter

---

[1]Plaintiff has been appointed pro bono counsel for the limited purpose of addressing summary
judgment and assisting at trial, as appropriate. See Court Docket Nos. 64, 72.



filed a supplemental motion for summary judgment on October 25, 2013, and after receiving an

extension of time to reply, Plaintiff filed a memorandum in opposition to the Defendants'

supplemental motion on March 14, 2014, to which the Defendants filed a Reply on April 3, 2014.

        The Defendants' supplemental motion for summary judgment is now before the Court

for disposition.[2]

### Background and Evidence

        Plaintiff alleges in Count II[3] of his Verified Complaint[4] that he is an inmate with the

SCDC, and that the Defendants have violated his constitutional right to receive religious publications

(in particular, "Five Percenter" books and newspapers),[5] as well as by denying him the right to

practice his religious beliefs, which require him to read "voluminous religious text" daily, and by

denying him the right to receive computer internet generated material and personal photographs.

Plaintiff asserts that the Defendants are also in violation of a consent order entered by the Honorable

Patrick Michael Duffy, United States District Judge, on August 21, 1998, in <u>Mickel, et al., v. Moore,</u>

<u>et. al.,</u> Civil Action No.  2:96-5555 (D.S.C.).  Plaintiff alleges this consent order allows Five

---

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C.  The Defendants have filed a motion for summary judgment.  As this is a dispositive motion this Report and Recommendation is entered for review by the Court.

[3]Count 1, which related to conduct of Plaintiff's private counsel, has already been dismissed. <u>See</u> Order filed February 29, 2012 (Court Docket No. 18).

[4]In this Circuit, verified complaints by <u>pro se</u> litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the factual allegations contained therein are based on personal knowledge. <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

[5]The Five Percenters, also known as the Nation of Gods and Earths, have been designated by the SCDC as a Security Threat Group (STG) since 1995.  <u>See</u> <u>In re Long Term Administrative</u> <u>Segregation of Inmates Designated as Five Percenters</u>, 174 F.3d 464, 469 (4th Cir. 1999).



Percenters to possess Five Percenter newspapers and literature, which Plaintiff is being denied. Plaintiff further contends that, in addition to violating his constitutional rights, the Defendants' conduct is in violation of the RLUIPA. Plaintiff alleges that he has submitted requests to staff member and/or grievance forms concerning these "deprivations", to no avail.

Plaintiff seeks monetary damages, as well as injunctive relief. Plaintiff has attached to his Complaint, as exhibits, copies of a Step 1 Grievance form and a Request to Staff Member form addressing these matters, as well as a copy of the consent order entered in <u>Mickel, et. al. v. Moore, et al</u>. <u>See generally</u>, <u>Plaintiff's Verified Complaint</u>, with attached exhibits.

In support of summary judgment in the case, the Defendant Robert E. Ward has submitted an affidavit wherein he attests that he is Deputy Director for Operations of the SCDC. Ward attests that Plaintiff is currently an inmate assigned to the Maximum Security Unit (MSU) at the Kirkland Reception and Evaluation Center. Ward attests that Plaintiff has been assigned to the MSU since October 10, 2003 for stabbing and killing another inmate at the Lieber Correctional Institution, a crime for which he was convicted and is currently serving a life sentence. Ward attests that the Maximum Security Units are governed by SCDC Policy No. OP-22.11, and that ¶¶ 13.2 and 13.3 of that Policy prohibits inmates from receiving books, magazines and newspapers by mail. Ward attests that, to his knowledge, this policy has been upheld as constitutional by the federal courts in prior cases, and that a similar prohibition in effect in Special Management Units (SMU) has also, to his knowledge, been upheld by the federal courts.

Ward attests that the prohibition at issue is content neutral, and applies to all types of books and publications regardless of content. Ward attests that this includes magazines, newspapers, and books of a religious nature or content, as the policy does not include any exceptions or

3



exemptions based on the content of the materials.  Further, ¶ 13.3 provides that inmates may not receive clippings from magazines and newspapers in their correspondence, which includes any materials printed from the internet.  Ward attests that this prohibition is necessary because, without it, the prohibition on magazines, newspapers and books as a whole would be compromised, the beneficial effects of such a policy would be effectively lost, and that any such loophole would unfairly disadvantage those inmates who did not have a source outside of the SCDC for clippings, excerpts, and materials printed from the internet to be mailed to them.

Nonetheless, Ward attests that under the current policy MSU inmates are allowed to possess a primary religious book, such as a bible or Qur'an, are also allowed access to their legal materials, and are further permitted to possess from one to three books or magazines (depending on what security level they are), which can be obtained through Library Services.  Ward attests that one of the primary purposes for this policy was to create a level system within the MSU to encourage and reward proper behavior, while also serving as an incentive or motivation for inmates placed in the MSU to alter their behaviors to obtain release from the MSU.  Ward attests that the SCDC has very limited means to encourage and promote discipline in the MSU given the nature of the Unit and the restricted privileges already present, and that the limitation on books and magazines - as part of a level system - serves to promote better behavior and discipline, which is an important and necessary reason for this policy.

Ward attests that the MSU is not designed to be a favorite or comfortable housing assignment, and that the accompanying loss of privileges associated with the inmates' assignment to the MSU serves as an incentive and motivation for inmates in the general population to adjust their behavior to avoid an assignment to the MSU.  It also serves as an incentive for inmates not to commit



the types of offenses that will result in such placement, and as such fosters discipline and order for inmates both within the MSU and outside the Unit.  Further, the limitation on books and magazines is necessary for security reasons, as it is important that limitations be placed on the amount of property that an inmate can possess in his cell, and in particular property consisting of paper which can lead to tremendous clutter and provide inmates with hiding places for weapons and contraband.

Ward attests that this policy was also adopted to serve as a deterrent for certain improper uses of paper available from books, newspapers and magazines, as there is a history in lockup units of inmates using paper from books, magazines, and newspapers acquired through the mail to cover cell windows to conceal activity within the cell and to jam the locks to prevent entry into the cell, as well as being used to stop up toilets and cause flooding.  Ward attests that these types of incidents are not only disruptive of the day to day operation of these lock up units, but also create the need for additional manpower as well as the need for direct contact between the staff and inmates (such as force cell movement teams), and that by taking steps to avoid or minimize such events, this policy serves to increase the safety and security of all lock up units, including the MSU.

Ward attests that, in the past, where inmates had access to personally owned books, magazines or newspapers obtained through the mail, they had no incentive not to use those personal materials for improper purposes because another books, magazines or newspapers could be received through the mail, but that by restricting the inmates' access to books and magazines obtained only through Library Services, inmates have an incentive not to misuse those materials for purposes such as setting fires, covering cell windows, jamming locks or stopping up toilets.

Ward attests that, in his judgment, a religious exemption or exception to this policy would not be workable, because if such an exemption were to be implemented, corrections officials



would be called upon to make judgment calls to determine whether a certain book or periodical is religious in nature or content. Ward attests that that would put officials in an impossible situation and subject them unnecessarily to controversy or disagreements with the inmates, and ultimately to more exposure to lawsuits. Further, a religious exemption would also make the policy content-based, which could call into question it constitutionality. Ward attests that, based on his prior experience, a religious exemption would require substantially more resources and manpower to determine whether particular materials are subject to the exemption and would be very time consuming, and that the SCDC simply does not have the resources to increase manpower in the lock up units for this purpose. Further, Ward attests that, to date, the policy in its current form has been upheld several times by the courts.

Ward attests that because the policy allows inmates to possess a primary religious book, the prohibition on the receipt of books and magazines through the mail should not prevent an MSU inmate from exercising his religious beliefs. With respect to the prohibition on personal photographs in the MSU, Ward attests that the possession of personal photographs is a privilege that has been denied to MSU inmates, but which inmates in the general population and other units are allowed. Ward attests that this ban on photographs therefore encourages MSU inmates to correct their behavior in order to obtain their release from the MSU to a less restrictive unit where privileges, such as possession of personal photographs, are allowed. Ward attests that this ban has a deterrent effect on non-MSU inmates to adjust their behaviors to avoid placement in the MSU, and that to his knowledge, the ban on personal photographs in the MSU has also been upheld by the federal courts as a valid and constitutional policy. See generally, Ward Affidavit. See also, Defendants' Exhibit [SCDC Policy No. OP-22.11].



The Defendants have also submitted an affidavit from Anthony Mattox, who is the Captain in charge of the MSU at the Kirkland Reception and Evaluation Center. Mattox attests in his affidavit to many of the same facts attested to by Ward in his affidavit. Additionally, Mattox attests that Plaintiff is currently listed in the SCDC Offender Management System as having no religious affiliation, that Plaintiff has made no request for religious exercise or accommodations to him during his tenure in the MSU, and that he is unaware of any religious affiliation the Plaintiff may have. In particular, Mattox attests that he has no knowledge of Plaintiff being or claiming to be a member of the Five Percenters group, nor is there any record of Plaintiff possessing Five Percenter materials or literature. Further, Mattox attests that all incoming mail is inspected, and that he is unaware of any Five Percenter materials or literature having been received by the Plaintiff and confiscated from his mail. Mattox also attests that if an inmate in the MSU has a specific request for religious material or pastoral services, that request is forwarded to the Chaplin at Kirkland, and that he is unaware any requests for religious materials or pastoral services that have been made by the Plaintiff while in the MSU.

Mattox also attests that the SCDC, in part, manages behavior of MSU inmates by using a level system which encourages and rewards appropriate behavior. Level III inmates have the most privileges, while Level I have the fewest privileges. Mattox attests that Plaintiff is presently a Level III inmate, and that as a Level III inmate, Plaintiff is currently allowed to possess up to three paperback books or periodicals at a time, which are available from a book cart in the MSU and may be interchanged at least weekly. Mattox also attests that these library books and magazines may be kept as long as necessary, and may be directly exchanged for different books and magazines. Mattox attests that he has personally swapped out books and magazines on the book cart to make certain that

7



inmates have some variety of reading materials from which to select, and that efforts are made to change or update the books and periodicals available on the book cart depending on the contributions received from local libraries and other similar sources. Further, in addition to the number of books or periodicals allowed by his level, Plaintiff is also allowed to possess a primary religious book such as a Bible or Qur'an, and is allowed access to legal books and materials through a Westlaw terminal located in the MSU. Mattox also attests that as a Level III inmate, Plaintiff has television privileges 24 hours a day, 7 days a week, which includes continuous access to commercial television broadcasts including the four major networks, SCETV, and others. Mattox attests that Plaintiff therefore has access to religious broadcasting that is available on those commercial broadcasts. See generally, Mattox Affidavit.

The Defendants have also submitted an affidavit from John Houser, the Chaplin at the Kirkland Reception and Evaluation Center. Houser attests that Plaintiff is currently listed in the SCDC Offender Management System as having no religious affiliation, and that he is unaware of any religious affiliation Plaintiff may have and that Plaintiff has made no requests to him or to his office for religious materials or for accommodations or to be allowed to participate in any religious activities since he has been house in the MSU. Houser attests that he is also unaware for any requests for religious materials or pastoral services that have been made by the Plaintiff. As for access to a primary religious book, Houser attests that if an MSU inmate does not have his primary religious book in his possession, he will make an effort to obtain a copy for him. See generally, Houser Affidavit.

Finally, The Defendants have also submitted an affidavit from Elbert Pearson, who attests that he is an investigator with the Special Investigations Unit of the SCDC, and that his duties



include the investigation of security threat groups (STG) and members of STG's under the authority

of SCDC Policy No. OP-22.01, entitled "Security Threat Groups".  Pearson attests that STGs are

groups that have been designated by the SCDC Director to be a threat to the security of correctional

institutions within the SCDC system, and that he has been trained to recognize identification factors

that indicate an inmate's potential membership in an STG, as well as evidence of validation such as

tattoos, name changes, and other evidence of an inmate's confirmed membership in an STG.

Pearson attests that the Nation of Gods and Earths, commonly referred to as the "Five

Percenters", has been designated an STG by the SCDC, and has also been recognized nationally as

a known STG, including by other state correctional systems as well as by the Department of

Homeland Security.  Pearson attests that Five Percenters have been a constant threat to the security

of correctional institutions in South Carolina because of their zealous members and organized

activities, including organized violence towards correctional officers and other inmates.  Pearson

attests that the group and its members have been disruptive to the safe, secure and orderly operation

of SCDC facilities on a number of occasions, all of which precipitated the designation of the Five

Percenters as an STG by the SCDC director.

Pearson attests that the Five Percenters are not a religion; they are a gang, a hate group

that teaches a racist ideology of black supremacy.  Pearson attests that the Five Percenters teach that

the black man is god and the white man is the devil who is not to be obeyed or trusted, and that

members specifically disavow connection to a religion or that the group is a religion or a religious

organization.  Rather, Five Percenters state that they are a "culture" or "way of life".

Pearson attests that, once an individual has been deemed a suspected member of an

STG, the Special Investigations Unit goes through a rigorous investigation of that individual to see



if they can be validated as an STG member. Pearson attests that, in order to be validated, the individual must exhibit at least two validating factors, and that while the self-admission by an inmate that he is or wants to be a member of an STG may be considered one validating factor, that alone is never sufficient, as the SCDC has found that inmates falsely claim membership in an STG for a variety of reasons, and therefore the self-admission must be corroborated by consideration of other factors after a full validation investigation is conducted. Pearson attests that Plaintiff is not known nor has he ever been validated as a member of the Five Percenters, or of any other STG. Indeed, the Special Investigations Unit has no file on the Plaintiff. Pearson further attests that he understands that Plaintiff does not actually allege in his lawsuit that he is a Five Percenter, but rather is only seeking the ability to receive Five Percenter literature through the mail. However, Pearson attests that because the Five Percenters have been designated as an STG, the Five Percenter literature, writings, and other related information have been declared to be contraband within the SCDC, and that as a result no person who is not validated and identified as a member of the Five Percenters may possess Five Percenter literature, writings, and other related information. Pearson attests that, at the present time, Plaintiff has not been authorized to possess Five Percenter literature, writings, and other related information because he has not been validated as a Five Percenter.

Pearson attests that in order to comply with a consent order entered in the <u>In re Long Term Administrative Segregation of Inmates Designated as Five Percenters</u>, litigation, a process was created and has been in place for years that allows inmates that are confirmed STG members and are confined in the MSU or SMU to possess STG materials, and that when a validated STG member complies with that process, the STG materials are returned to that inmate's personal property and may be possessed by him, subject to limitations on the quantity of personal property allowed in the MSU



or SMU.  Pearson further attests that if an inmate has been confirmed as an STG member and confined to the MSU or SMU and has requested the return and/or possession of STG materials, then that inmate is required to sign a form furnished by his office that states the inmate is a member of the particular STG and that the inmate wishes to have the materials and literature of his STG while in the MSU or SMU.  This form specifically states that if the material or literature is found outside of the inmate's cell, it will be confiscated as contraband and not returned.

Pearson attests that, pursuant to this process, any suspected STG material will be sent to his office, where it is reviewed to determine whether or not it is the type of material that can be possessed by the inmate.  At that time, the material is stamped with the inmate's SCDC identification number.  Once the material has been stamped and approved, and the inmate has signed the form, the inmate can have access to the materials in accordance with the applicable MSU or SMU policies.  However, if the materials are found outside of the inmate's cell, or if a copy of the materials are found outside of the inmate's cells, the materials are confiscated and not returned.

Pearson attests that this process is designed to allow the SCDC to identify and maintain control of STG materials which are considered contraband, while allowing access to the materials by a confirmed STG member within his own MSU or SMU cell and for his own use.  However, this process has never been utilized with respect to the Plaintiff, because Plaintiff has never claimed to be a member of the Five Percenters, has never been validated as a member of the Five Percenters, and has never received Five Percenter literature in his mail or otherwise.  See generally, Pearson Affidavit.

In opposition to the Defendants' motion for summary judgment, Plaintiff has submitted an affidavit wherein he attests that he has been housed in the MSU at the Kirkland



Correctional Institution since October 2003, during which time he has not been disciplined or punished for any behavioral issue or disciplinary infraction. Plaintiff attests that he has not designated a single religious affiliation, but desires to learn more about several different religions, including the Nation of Gods and Earths, the Nation of Islam (Muslim), and Christianity. Plaintiff attests that, to date, the only religious books, materials or literature he has been allowed to receive as a Level III inmate is a Bible.

With respect to the Five Percenters, Plaintiff states that he "understand[s]" that there are many misconceptions about the Five Percenters as being anti-white, violent, and gang-related, but that he is neither anti-white nor violent, nor is he a member of any gang. Plaintiff attests that the merely desires to pursue a path of self-knowledge, righteousness and religious diversity. Plaintiff then goes on to talk about the teachings of the Five Percenters, and complains that because of his placement in the MSU, he is unable to obtain primary books, materials, literature or other primary source materials which are "fundamental to the Nation of Gods and Earths". With respect to Pearson's statement in his affidavit that Five Percenters are not a religion; they are a gang, Plaintiff attests that he is not aware of any other religion or religious literature or writings that have been declared contraband within the SCDC. Plaintiff also states that he is not engaged in any organized violence towards correctional officers or other inmates, that he does not wish to be labeled, and that he should not be forced to be labeled by the SCDC as a member of an STG because of his desire to read and study primary books, materials, and literature that are fundamental to the Nation of Gods and Earths.

Plaintiff further attests that, in addition to the Five Percenter material, he has not been permitted to have the Qur'an, nor has he been permitted access to many other publications of the



Nation of Islam, because under the SCDC's policy, he can only have a copy of the Qur'an if it is a primary source book for his religion, and only after he has been placed on the SCDC's approved list as being a Muslim.

Plaintiff also attests that none of these materials relating to the Five Percenters or the Nation of Islam are available on the book cart or from Library Services, and that he has never been told that Chaplin Houser, or any of the Chaplins at Kirkland, would make an effort to obtain any of these materials for him.  Plaintiff attests that although he understands that membership in an organized religious denomination would simplify this issue, his religious belief is no less sincere just because he does not subscribe to one particular religious organization or belief system, and that he should not be forced by the SCDC to designate a single religious affiliation or denomination.  Further, while Plaintiff concedes that the Defendants have an interest in maintaining security, order and discipline within the MSU, the SCDC policy at issue leaves him with no available alternative means of exercising his First Amendment Right to pursue his religious beliefs.  Plaintiff further complains that, as applied by the Defendants, the policies at issue are not neutral, but target those like him with diverse, multi-faith religious beliefs, as well as those who subscribe to the non-violent philosophical teachings of the Five Percenters.

Plaintiff argues that there have to be available alternatives that would fully accommodate his religious beliefs without sacrificing the security, order and discipline in the MSU, such as allowing him to have paperback copies of the Qur'an and publications of the Five Percenters in addition to the Bible he is permitted to have, so long as he does not exceed the three paperback books or periodicals limitation in the SCDC policy.  Similarly, with respect to the prohibition against receiving any religious magazines, newspapers or books by mail, clippings from religious magazines,

13



or personal photographs of a religious nature by mail, Plaintiff argues that there has to be a reasonable alternative that could fully accommodate his religious beliefs without sacrificing the security, order and discipline in the MSU.  Plaintiff also attests that, since being placed in the MSU in 2003, he has not used any paper to stop up toilets, cause flooding, set fires, or conceal weapons or contraband.  See generally, Plaintiff's Affidavit.

As an attachment to their reply memorandum, the Defendant Ward has submitted a supplemental affidavit in which he attests that, prior to the receipt of Plaintiff's response, he had no knowledge of Plaintiff ever having claimed any religious affiliation, that Plaintiff has a serious disciplinary history, and that personal exemptions such as are being sought by the Plaintiff to Defendants' policies would not be feasible or workable.  See generally, Ward Supplemental Affidavit.

### Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Rule 56, Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial.  Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).  Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts

14



which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists.  <u>Weller v. Dep't of Social Services</u>, 901 F.2d 387 (4th Cir. 1990).

# I.

## (Constitutional Claim)

As previously noted, the only issue being addressed by the undersigned with respect to Defendants' supplemental motion for summary judgment is whether they are entitled to qualified immunity.  <u>See</u> Order of October 15, 2013 (Court Docket No. 75).  Plaintiff's claims for equitable relief are not covered by the Doctrine of Qualified Immunity, as this Doctrine is not applicable to suits for declaratory or injunctive relief.  <u>Wall v. Wade</u>, 741 F.3d 492, 498, n. 9 (4th Cir. 2014); <u>see also</u> <u>South Carolina State Bd. of Dentistry v. FTC</u>, 455 F.3d 436, 446-447 (4th Cir. 2006); <u>Morse v. Frederick</u>, 551 U.S. 393, 432-433 (2007)["A qualified immunity defense applies [only] to damages actions, but not to injunctive relief"].  Therefore, the Defendants are not entitled to summary judgment with respect to Plaintiff's claims for injunctive or declaratory relief.

With respect to Plaintiff's claim for monetary damages, the Supreme Court in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), established the standard which the Court is to follow in determining whether a defendant is protected by qualified immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

<u>Harlow</u>, 457 U.S. at 818.

The Court of Appeals for the Fourth Circuit has stated:

> Qualified immunity shields a government official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harwell</u>, 457



> U.S. at 818. "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level but at the level of its application to the specific conduct being challenged." <u>Pritchett v. Alford</u>, 973 F.2d 307, 312 (4th Cir. 1992). Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." <u>Maciariello v. Sumner</u>, 973 F.2d 295, 298 (4th Cir. 1992) . . . As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

<u>Wiley v. Doory</u>, 14 F.3d 993, 995 (4th Cir. 1994)(internal citations omitted), <u>cert</u>. <u>denied</u>, 516 U.S. 824 (1995).

The question thus becomes whether, considering the facts and evidence in the light most favorable to the Plaintiff, the Plaintiff has set forth allegations sufficient to give rise to a genuine issue of fact as to whether any Defendants' conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. The evidence does not support such a finding in this case.

Simply put, even assuming for purposes of summary judgment that the Defendants' application of the policy at issue is sufficient to create a genuine issue of fact as to whether a constitutional violation has occurred, any such violation was not of a clearly established right of which a reasonable person would have known because, as correctly noted by the Defendants in their brief, in general restrictions such as those identified in the evidence have previously been upheld by the courts as meeting constitutional muster. <u>See</u> <u>generally</u>, <u>Stroman v. Byars</u>, No. 10-3240, 2012 WL 2873762, at * 3 (DSC June 13, 2012), <u>adopted by</u>, 2012 WL 2873747 (D.S.C. July 13, 2012)[MSU ban on personal photographs not a violation the First Amendment]; <u>Corey v. Reich</u>, No. 02-2801, 2004 WL 3090234 (D.S.C. March 9, 2004) [Upholding SCDC policy restricting prisoners' ability to receive magazines, books, mail, or other materials in the MSU, and finding that this policy did not violate the prisoners' constitutional rights], <u>aff'd by</u> 2004 WL 1730327 (4th Cir. Aug. 3, 2004); <u>Wiles</u>

16



v. Ozmint, No. 05-2111, 2006 WL 2260136, at * 10 (D.S.C. Aug. 7, 2006)[Prohibition on the receipt by mail of magazines, newspapers and books in the MSU, and restriction on photographs being allowed in MSU cells, held constitutional]; Williams v. Ozmint, No. 07-2409, 2008 WL 4372986, at ** 5-6 (D.S.C. Sept. 22, 2008)[SCDC Policy No. OP-22.11 limiting access to books, magazines and photographs for inmates in the MSU constitutional]; see also Five Percenters, 174 F.3d at 469-470 [Upholding the SCDC's STG policy as constitutional, finding that the designation of the Five Percenters as an STG was rationally related to the legitimate objective of penal security, and concluding that there was "ample evidence in the records supporting the reasonableness of [the Director's] conclusion that the Five Percenters as a group posed a threat to prison safety"]; cf. Fraise v. Terhune, 283 F.3d 506, 518 (3d Cir. 2002)["Demanding proof [that members of the Five Percenters are required to engage in violence or hard statistics to show that members have committed more violent acts] before correctional officers can act to prevent gang violence is fundamentally inconsistent with Turner[6] and would in all likelihood be paralyzing."]; Loveless v. Lee, 472 F.3d 174, 200 (4th Cir. 2006)[Finding that free exercise restrictions that are "reasonably adapted to achieving a legitimate penological objective" are permissible]; Vasquez v. Frank, No. 05-528, 2005 WL 2740894 at *12 (W.D.Wisc. 2005) ["[R]estrictions on a[n] inmate's receipt of...photographs as part of an incentive program were reasonably related to the prison's legitimate interest in promoting good behavior"], aff'd in part, vacated in part (on other grounds), 2006 WL 3623044 (7th Cir. Dec. 13, 2006); Ramirez v. McCaughtry, No. 04-335, 2005 WL 2010173 (W.D.Wisc. 2005) [upholding policy that restricted access to newspapers, magazines, and photographs to inmates in segregation as part

---

[6]Turner v. Safley, 482 U.S. 78 (1987).  Under Turner, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id., at 89.



of an incentive system for good behavior]; <u>Incumaa v. Ozmint</u>, No. 03-2776, 2004 WL 5778458 (D.S.C. Oct. 26, 2004); <u>Beard v. Banks</u>, 548 U.S. 521 (2006) [system of suspension of privileges valid means of attempting to control behavior]; <u>Daigre v. Maggio</u>, 719 F.2d 1310, 1313 (5th Cir. 1983)["To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already in prison. Left free to write to anyone in the world and to receive literature of any kind, a prisoner might find punitive isolation desirable, offering solitude and leisure as an alternative to the ordinary conditions of prison work and life. Thus, a narrower restriction on first amendment interests would likely prove ineffective in maintaining discipline"]; <u>Gregory v. Auger</u>, 768 F.2d 287, 290 (8th Cir. 1985) [restrictions on certain types of correspondence, including junk mail, newspapers and magazines serve a legitimate penalogical objective of "deterrence of future infractions of prison rules"]; <u>Savko v. Rollins</u>, 749 F.Supp. 1403, 1409 (D.Md. 1990) [Limitation on the amount of in-cell religious reading material contained in prison regulation is constitutional under <u>Turner</u> standards]; <u>Incumma v. Stirling</u>, No. 12-3493, 2014 WL 958679 (D.S.C. March 11, 2014)[Upholding STG Policy as applied to Five Percenters].

Concededly, prison rules and regulations that have the effect of restricting or hindering religious beliefs or practices may run afoul of the free exercise clause of the First Amendment. <u>Morrison v. Garraghty</u>, 239 F.3d 648, 659 (4th Cir. 2001); <u>Loveless</u>, 472 F.3d at 198. However, for purposes of a qualified immunity defense, a right is clearly established for purposes of qualified immunity only when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right. <u>Williams v. Bitner</u>, 455 F.3d 186, 191 (3rd Cir. 2006). Here, in light of the fact that the courts have previously upheld SCDC policies restricting MSU inmates'



access to literature, photographs and other such objects, including religious materials; have also specifically addressed and upheld the provisions of SCDC Policy No. OP-22.11 (the SCDC policy primarily at issue in this lawsuit); and have specifically approved restrictions on Five Percenters and the receipt and dissemination of Five Percenter material and publications, the undersigned cannot find that, even if after review on the merits a constitutional violation is found in the Plaintiff's allegations, the Defendants would have otherwise understood that what they were doing was a violation of Plaintiff's constitutional rights.  Williams, 455 F.3d at 191; see also Saucier v. Katz, 533 U.S. 194, 202 (2001).

In conclusion, the Defendants are entitled to qualified immunity from any monetary damages claimed by the Plaintiff, and should therefore be granted summary judgment on Plaintiff's claim for monetary damages for violations of his constitutional rights.  Harlow, 457 U.S. at 818 [Qualified immunity shields state officials from liability where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known]. However, as the only issue before this Court is the question of qualified immunity, and as a qualified immunity defense only applies to Plaintiff's claim for monetary damages, not to injunctive relief; Morse, 551 U.S. at 432-433; Defendants' motion for summary judgment with respect to Plaintiff's claim for injunctive relief for violations of his constitutional rights should be denied.  Walls v. Wade, 741 F.3d 492, 498, n. 9 (4th Cir. 2014)["[P]laintiff's claims for equitable relief are not affected by the doctrine of qualified immunity, which has no application to suits for declaratory or injunctive relief"] (internal citations and quotations omitted).



## II.

### (RLUIPA Claim)

Plaintiff also seeks both monetary damages and injunctive relief for his claims under the RLUIPA. However, Congress has not authorized damages claims against state officials under the RLUIPA. Wall, 741 F.3d at 496, n. 5; see also Sossamon v. Texas, 131 S.Ct. 1651, 1658-1659 (2011)[Prohibiting damages claims against state officials in their official capacity under the RLUIPA]; Selby v. Caruso, 734 F.3d 554, 561 (6th Cir. 2013)[Plaintiff could not state a claim against State for damages under RLUIPA]; Wrendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009)[Same for individual capacity]; McCreary v. Richardson, 738 F.3d 651, 655 (5th Cir. 2013)[Inmate not entitled to monetary damages under RLUIPA for a suit against correctional officer in his individual capacity]; Easterling v. Pollard, 528 Fed.Appx. 653, 656 (7th Cir. July 22, 2013)[same]; Maloney v. Ryan, No. 03-314, 2014 WL 1230432 at * 5 n. 3 (D.Ariz. Mar. 25, 2014)[Discussing that Fourth, Fifth, Seventh and Eleventh Circuit have reached the issue of whether individuals can be liable for damages under RLUIPA and held that they cannot be]. Therefore, the Defendants are entitled to summary judgment to the extent Plaintiff is seeking monetary damages under the RLUIPA.

With respect to Plaintiff's request for equitable relief under the RLUIPA, however, as was the case with Plaintiff's constitutional claim, the defense of qualified immunity only applies to claims for damages. Hammons v. Saffle, 348 F.3d 1250, 1258, n. 1 (10th Cir. 2003); cf. Kikumura v. Hurley, 242 F.3d 950, 962-963 (10th Cir. 2001)[Noting that defense of qualified immunity under the Religious Freedom Restoration Act ("RFRA"), as amended by the RLUIPA, did not apply to claims for equitable relief]. Therefore, Defendants' motion for summary judgment with respect to Plaintiff's claim for injunctive relief under the RLUIPA should be denied, as the Defendants are not



entitled to qualified immunity from suit under that statute, which is the only defense before the Court for review. Chernetsky v. Nevada, No. 06-252, 2013 WL 5278723 at * 3 n. 5 (D.Nev. Sept. 17, 2013)["Qualified immunity shields government officials from civil damages; therefore, when the Ninth Circuit remanded plaintiff's RLUIPA claim, the individuals continue as named defendants because plaintiff is seeking injunctive relief."]; White v. Linderman, No. 11-8152, 2013 WL 4496364 at * 12 (D.Ariz. Aug. 22, 2013)["[Q]ualified immunity does not bar a suit for declaratory or injunctive relief, both of which plaintiff seeks in this action."] [Case including RLUIPA claims].

### Conclusion

Based on the foregoing, it is recommended that the Defendants be **granted** summary judgment on Plaintiff's claims for monetary damages under both his constitutional claim and his claim under the RLUIPA. However, the Defendants are not entitled to qualified immunity from suit on Plaintiff's claims for injunctive relief, and as a result the Defendants' motion for summary judgment with respect to Plaintiff's claims for injunctive relief should be **denied**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

April 7, 2014
Charleston, South Carolina

21



## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29401

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

